IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOSIE ANNE MULLINS, | ) | CASE NO. 3:20CV1146 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JAMES R. KNEPP II |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Josie Anne Mullins ("Mullins") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

**I. Procedural History**

Mullins protectively filed an application for DIB in July 2017, alleging a disability onset date of May 10, 2011. Tr. 445, 654. She alleged disability based on the following: multiple sclerosis, fatigue, bladder issues, and nerve issues in arms and legs. Tr. 168. After denials by the state agency initially (Tr. 63) and on reconsideration (Tr. 74), Mullins requested an administrative hearing. Tr. 87. A hearing was held before an Administrative Law Judge ("ALJ") on February 20, 2019. Tr. 28. In his April 18, 2019, decision (Tr. 15-23), the ALJ determined that there were jobs that existed in significant numbers in the national economy that

1

Mullins could have performed through her date last insured, i.e., she was not disabled.  Tr. 22-23.  Mullins requested review of the ALJ's decision by the Appeals Council (Tr. 140) and, on March 25, 2020, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Mullins was born in 1973 and was 44 years old on her date last insured.  Tr. 22.  She completed twelfth grade.  Tr. 34.  She last worked in 2012 at a pizza shop waiting tables and doing some deliveries.  Tr. 34.

### B. Relevant Medical Evidence[1]

In June 2015, a brain MRI showed that Mullins had a tiny region of increased signal intensity in the left inferior parietal region, likely related to a small demyelinating plaque where her eleven-year history of multiple sclerosis ("MS") was noted.  Tr. 427.

A brain MRI from April 2017 showed a small deep white matter lesion in the left hypothalamus adjacent to the third ventricle but was less prominent than a January 2017 examination.  Tr. 268-269.  A July 2017 brain MRI showed no evidence of active demyelination or new lesions since April 2017.  Tr. 777.

In October 2017, Mullins started physical therapy for pain and instability in her left ankle and pain in her right great toe and a remote right great toe fracture.  Tr. 1206.

On March 2, 2018, Mullins had a follow up visit with the neurology department.  Tr. 1518.  The treatment note states that Mullins' most recent MS attack was in 2005.  Tr. 1519.  To treat her symptoms, Mullins took medication and exercised.  Tr. 1519.  She also received

---

[1] Mullins did not provide a statement of medical facts in her brief and states that she "agrees generally with the summary of medical facts" in the ALJ's decision.  Doc. 12, p. 2.

injections.  See, e.g., Tr. 938, 1057.

On March 16, 2018, Mullins had ankle arthroscopy surgery.  Tr. 1439.

In April 2018, Mullins complained of hand numbness and had a nerve conduction study, which was normal.  Tr. 1492, 1499.

In September 2018, a brain MRI showed a stable appearance with three foci of white matter signal abnormality that were nonspecific but could represent areas of previous demyelination.  Tr. 1139.  A cervical spine MRI showed lesions in her cervical spinal cord and upper thoracic spinal cord, likely related to her history of demyelinating disease.  Tr. 1140-1141.

In November 2018, Mullins visited the internal medicine department after a positive nuclear antibody test and muscle pain.  Tr. 1349, 1351.  She also reported back pain and fatigue.  Tr. 1351.  Upon exam, she had a few mild trigger points around her mid-back and tenderness to palpation.  Tr. 1351.  She had no redness or swelling of her joints, an active range of motion in all extremities with no atrophy or abnormal movements noted, and normal strength and gait.  Tr. 1351.

### C. Opinion Evidence

#### 1. Treating source

On February 13, 2019, Dr. Alexander, D.O., completed a form entitled "Multiple Sclerosis Treating Physician Data Sheet" on Mullins' behalf.  Tr. 1605-1612.  Dr. Alexander stated that Mullins experienced pain and moderate fatigue.  Tr. 1609.  She opined that Mullins either had no other specific symptoms or that it was "unknown" whether Mullins experienced other symptoms.  Tr. 1607-1609.  Dr. Alexander also indicted that it was largely "unknown" what limitations Mullins would have in the workplace.  Tr. 1609-1612.

#### 2. State Agency Reviewing Physicians

3

On August 16, 2017, Dr. Thomas, M.D., reviewed Mullins' record and, regarding her RFC, opined that Mullins could lift 10 pounds occasionally and 20 pounds frequently, stand and/or walk 4 hours and sit for 6 hours out of an 8-hour workday, and had postural limitations due to her fatigue and MS, and environmental restrictions due to MS.  Tr. 58-60.  On October 29, 2017, Dr. McKee, M.D., adopted Dr. Thomas' opinion.  Tr. 69-71.

**D. Testimonial Evidence**

**1. Mullins' Testimony**

Mullins was represented by counsel and testified at the administrative hearing.  She lives with her husband and her adult daughter.  Tr. 32.  She has a driver's license and drives some.  Tr. 33-34.  There isn't really a physical limitation on her ability to drive, she just doesn't like to drive long distances and she doesn't drive at night.  Tr. 34.

When asked why she stopped working as a waitress at a pizza shop in 2012, Mullins answered that she felt she was falling apart a little bit and she kept getting urinary tract infections (UTI) and shin splints from being on her feet all the time.  Tr. 38.  She was diagnosed with MS in 2005.  Tr. 38.  The MS is starting to take a toll on her body.  Tr. 38.  Since she has had MS, she has chronic fatigue and it's getting worse.  Tr. 38.  She has side effects from her medications, and the combination of everything caused her body to not be able to handle the workload anymore.  Tr. 38.

When she was diagnosed with MS in 2005, she started treatment right away.  Tr 39.  She got Rebif injections three times a week.  Tr. 39.  The injections hurt and gave her flu-like symptoms.  Tr. 39.  She received the injections throughout the time she was working at the pizza shop and it was very hard getting the shots through the years.  Tr. 39.  Now, she takes a pill for her MS instead of an injection.  Tr. 39.  Dr. Alexander is the physician she sees to treat her MS.

4

Tr. 42.

When asked if the conditions which caused her to leave her job—shin splints, UTIs, fatigue—were still present, Mullins answered that she still gets UTIs sometimes and she has had fatigue since she was first diagnosed with MS but it has progressed over the past couple of years. Tr. 40. When asked what she has noticed over the past couple of years regarding her fatigue, Mullins stated that she has developed pain all over her body. Tr. 40. Everything else, including her fatigue, seems to have gotten worse. Tr. 40. For instance, when performing daily activities at home, she does "stuff" for a little bit and then she gets tired and has to take a break. Tr. 41. Or, she doesn't get enough sleep at night and then she is very tired during the day. Tr. 41. The fatigue is a constant fight for her. Tr. 41. When asked what activities the fatigue affects, Mullins answered, "Anything"; for example, "folding laundry." Tr. 41. She tries to do a few things at home every day and sets a goal. Tr. 41. She will do a couple things and then take frequent breaks. Tr. 41. She might run the sweeper; she can't do anything requiring heaving lifting. Tr. 41. When asked what she cannot do, Mullins replied that she cannot bend over to load the washer or clean her shower. Tr. 41. She can't bend over because of pain in her ribcage area. Tr. 41-42. She has had constant pain in that area for the past couple of years, but no one can figure out what it is. Tr. 42. When asked if she could perform a job that primarily requires her to sit, Mullins stated that she could not because sitting for a long time is hard on her back and her body. Tr. 42.

On a typical day, Mullins wakes up at 5 or 6 am., makes her bed, and sits down to get dressed due to balance issues. Tr. 42. Sometimes she makes herself something for breakfast. Tr. 42-43. She doesn't really do a lot in the morning; it depends how tired she is. Tr. 43. In the winter, she will try to keep her mind off things and sit and do some puzzles. Tr. 43. She

5

generally helps with the cooking and cleaning, although her daughter is moving out so she will no longer be there to help. Tr. 43. Otherwise, she tries to relax and take it easy. Tr. 43. She has a small dog and, depending on the weather, she might walk two blocks with him. Tr. 43. She is afraid of falling on ice or snow so she tends to stay in a little bit more during the winter. Tr. 43.

When asked to describe the success of her MS treatments to date, Mullins stated that she has been told that she is on the correct medication. Tr. 43-44. Mullins explained that she has constant pain and issues with her bladder and bowels. Tr. 44. She has frequent headaches. Tr. 44. She had ankle surgery the year before and her foot still gets swollen and she has to elevate it. Tr. 44. Otherwise, surgery improved her ankle and it is doing "okay"; it's somewhat healed but it's never going to feel the same. Tr. 45. This past November she was dragging a table into her house from her porch and didn't realize the glass on top wasn't attached and it fell on her bare foot. Tr. 45-46. X-rays were normal but the top of her foot was bruised and hurt. Tr. 46. She's a bit clumsier than she used to be, so she tries not to do as much stuff. Tr. 46. She has a broken toe on her right foot that she will probably have to go back to the foot doctor for because she has a lot of issues with her foot and with standing and walking for a long time. Tr. 44.

When asked if her fatigue causes her to have to lie down and sleep during the day, Mullins answered yes. Tr. 46. When asked how often that happened, she answered, "it depends how much sleep I get at night." Tr. 46. If she only gets 4 or 5 hours of sleep, she might take 2 or 3 little naps. Tr. 46. If she had been running around performing errands with her husband or daughter during the day, the next day, if she is a little more exhausted, she may take a 2-hour nap, if needed. Tr. 46. If she does something strenuous, she feels like she needs a day of recovery. Tr. 47.

### 3. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing. The ALJ discussed Mullins' past work with the VE. Tr. 48-49. The ALJ asked the VE to determine whether a hypothetical individual with Mullins' work experience could perform her past work or any other work if that person had the limitations subsequently assessed in the ALJ's RFC determination, described below. The VE answered that such an individual could perform the following jobs with significant numbers in the national economy: general office helper, sorter, and inspector/packer. Tr. 49-50.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a

       severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In his April 18, 2019, decision, the ALJ made the following findings:

1.     The claimant last met the insured status requirements of the Social Security Act on December 31, 2017. Tr. 17.

2.     Despite a period of substantial gainful activity (SGA) following the alleged onset date, I do not make a determination at this step and proceed with the sequential evaluation. Tr. 17.

3.     Through the date last insured, the claimant has the following severe impairments: multiple sclerosis (MS). Tr. 18.

4.     Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

        one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 18.

5. Through the date last insured, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can stand and walk 4 hours in an 8 hour work day. She can frequently climb ramps and stairs; she can never climb ladders, ropes, or scaffolds. The claimant can frequently stoop, kneel, crouch and crawl. She must avoid concentrated exposure to extreme heat and cold, humidity, and pulmonary irritants. She can never be exposed to unprotected heights and hazardous machinery. Tr. 18.

6. Through the date last insured, the claimant was unable to perform any past relevant work. Tr. 21.

7. The claimant was born in 1973 and was 44 years old, which is defined as a younger individual age 18-49, on the date last insured. Tr. 22.

8. The claimant has at least a high school education and is able to communicate in English. Tr. 22.

9. Transferability of job skills is not material to a determination of disability because using the Medical-Vocational rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills. Tr. 22.

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed. Tr. 22.

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from May 10, 2011, the alleged onset date, through December 31, 2017, the date last insured. Tr. 23.

## V. Plaintiff's Arguments

Mullins argues that the ALJ erred because his RFC assessment does not account for her fatigue. Doc. 12.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

Mullins argues that the ALJ erred because his RFC assessment failed to account for how her pain and fatigue would affect her ability to stay on task or be present at work "when she is suffering from these conditions."  Doc. 12, pp. 3, 5.  She first points out that her treating physician, Dr. Alexander, diagnosed her with relapsing-remitting MS and had opined that Mullins experiences pain in her upper arms, hips, thoracic region, and under her breasts and fatigue due to her MS.  Doc. 12, pp. 3-4.  She also asserts that the medical record references Mullins' pain and fatigue.  Doc. 12, p. 4.  But the ALJ acknowledged that Mullins experienced pain and fatigue as a result of her MS.  Tr. 19, 20, 21.  The ALJ explained that Mullins' most recent MS attack was in 2005; she takes medication for it; nerve conduction studies were normal; MRIs showed signs consistent with MS, although, overall, the progress was relatively stable; and physical exam findings showed some tenderness but otherwise she had normal ranges of motion and normal strength and gait.  Tr. 19-20.  Mullins does not challenge any of those findings.  Doc. 12, p. 2.

Although Mullins contends that Dr. Alexander indicated, in her check-box opinion, that Mullins experienced pain and fatigue (Doc. 12, p. 3), Dr. Alexander did not provide any opinion

about Mullins' limitations in her check-box opinion, a point the ALJ commented upon. Tr. 21 (ALJ stating that Dr. Alexander indicated that Mullins had pain and fatigue but provided no opinion as to any functional limitations other than that Mullins is able to ambulate). The state agency reviewers, who provided the only opinion evidence in the record regarding functional limitations and cited medical evidence in support, restricted Mullins to performing a reduced range of light work due to her pain and fatigue from MS, which the ALJ adopted. Tr. 21, 59, 70. Thus, while Mullins argues that the ALJ erred because he did not find that Mullins would be off task or absent (Doc. 12, p. 4), she does not identify any opinion evidence in the record indicating that her condition would cause disabling off-task behavior or absenteeism. The fact that the VE testified that typical employers would not tolerate off-task behavior 15% or more in a workday or absences during a probationary period does not mean that the ALJ was required to include those limitations in his RFC assessment. *See Lipanye v. Comm'r of Soc. Sec.*, 802 Fed. App'x 165, 170 (6th Cir. 2020) ("By posing the question [regarding a hypothetical individual's ability to engage in work if she was off-task 10% of the workday], the administrative law judge did not make a finding or bind himself to a finding that plaintiff was off-task at least 10% of the workday. Nothing in the medical record would support inclusion of such a limitation.").

Mullins has not identified an error in the ALJ's decision. The ALJ's decision is supported by substantial evidence and must, therefore, be affirmed. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion).

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED.**

Dated: July 9, 2021

                                         */s/Kathleen B. Burke*
                                         Kathleen B. Burke
                                         United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).